SWIFT *et al. v.* ABERDEEN LUMBER Co. *et al.*

(Division A. February 4, 1935. Suggestion of Error Overruled April 1, 1935.)

[159 So. 301. No. 30770.]

698

Wm. I. McKay and Hirsh, Dent & Landau, all of Vicksburg, and Gilliland, Taylor & Gilliland, of Memphis, Tenn., for appellant.

700

Leonard E. Nelson, of Vicksburg, for cross-appellant.

**Brunini & Hirsch,** of Vicksburg, for appellees.

704

706

Argued orally by **W. I. McKay**, for appellant, and by **John Brunini**, for appellee.

**McGowen, J.,** delivered the opinion of the court.

By his original bill and subsequent amendments, the appellant, Swift, sought to enforce a vendor's lien for the purchase money of certain standing timber sold by him to the Delta Hardwood Lumber Company, and alleged to have been converted by that company, J. N. Woollett, and the Aberdeen Lumber Company, in disregard of his paramount, superior lien. Upon issue being joined by the answer of J. N. Woollett, cross-bill, and answer of Swift to the cross-bill, and separate answer of the Aberdeen Lumber Company, the proof was heard and the court below decreed to Swift a vendor's lien with the enforcement thereof on forty thousand feet of lumber, and decreed the balance of the lumber to be subject to a lien in favor of the Aberdeen Lumber Company, and giving it a right to sell same in pursuance of a sales agency contract. From that decree, the appellant, Swift, prosecuted an appeal here.

We shall set forth such evidence as we deem necessary to a proper understanding of the case.

On May 29, 1929, Swift and the Delta Hardwood Lumber Company, a Louisiana corporation, entered into a contract by which Swift agreed to sell, and the Delta Hardwood Lumber Company agreed to purchase, certain standing timber on ——— acres of land in Warren county, Mississippi, together with a sawmill, and a lease of the fifty-acre tract on which the sawmill was located.

On June 1, 1929, Swift executed a deed conveying the standing timber and the sawmill to the Delta Hardwood Lumber Company for a consideration of twenty-four thousand dollars cash, and eighteen thousand dollars evidenced by six notes for three thousand dollars each, due December 1, 1929, March 1, 1930, September 1, 1930, December 1, 1930, and March 1, 1931, all bearing six per cent interest per annum, and providing for ten per cent

attorney's fees if placed in the hands of an attorney for collection.

The vendor's lien reserved in the deed, after describing the notes, is as follows: "And all payable at the Merchants National bank in Vicksburg, Mississippi, and secured by a vendor's lien on the property hereinafter described and by a trust deed." After a lengthy description of the timber and of the sawmill, there appears an agreement that Swift reserved the right to use, without rental charge, that part of the fifty-acre tract upon which he (Swift) had stacked lumber, and then follows this stipulation: "It is further understood and agreed that the standing merchantable timber described above purchased by the Delta Hardwood Lumber Company may be cut and removed at its option under the terms and conditions above set out. The Delta Hardwood Lumber Company, when removing same, will deposit in cash in the First National Bank in Vicksburg, Mississippi, every thirty days, seven dollars per thousand for all hardwood timber cut except beechwood, and for beechwood cut shall deposit two dollars per thousand." The next and last paragraph in the deed reads, in part, as follows: "A vendor's lien is hereby retained to secure all deferred payments for purchase money."

On June 27, 1929, Swift signed a letter which had been prepared by Woollett in which Swift consented that the Delta Hardwood Company might lease the lumber yard of fifty acres for the purpose of stacking lumber in pursuance of the sales contract entered into by the Delta Hardwood Company and Woollett. This letter is claimed to be an estoppel, and will be considered in detail when we reach that point. The Delta Hardwood Lumber Company is a Louisiana corporation, and the Delta Hardwood Company is a Mississippi corporation, and the Louisiana corporation conveyed the standing timber acquired from Swift to the Delta Hardwood Company on August 1, 1929.

On June 27, 1929, the Delta Hardwood Company executed a proposal to enter into a sales contract with Woollett which was, by him, duly accepted. This contract was in anticipation of the acquisition by the Delta Hardwood Company of the standing timber conveyed to the Delta Hardwood Lumber Company by Swift.

The Delta Hardwood Lumber Company became a guarantor of the performance of the Delta Hardwood Company's contract with Woollett, and likewise, the Aberdeen Lumber Company became a guarantor on behalf of Woollett of his sales contract.

The sales contract provided, in short, that Woollett should be sales agent of all lumber manufactured by the Delta Hardwood Company, and Woollett agreed to make advances upon lumber by the Delta Hardwood Company, which, in turn, agreed to permit supervision of any lumber to be stacked on certain alleys, the stacks to be numbered, and deeds of trust were to be executed in favor of Woollett by the Delta Hardwood Company to secure payment of the advances. All of the output of the mill was to be exclusively sold by Woollett.

The Delta Hardwood Company began its operations and began drawing on the Aberdeen Lumber Company for advances before it acquired title to the Swift timber, and all transactions affecting the sale of the lumber and the advancement of money, throughout the whole course of the business, were made by the Aberdeen Lumber Company, and except for the use of Woollett's name in the sales contract and in the many deeds of trust, all the actual transactions were between the Hardwood Company and the Aberdeen Lumber Company, and the proof amply sustains the charge in the original bill, as amended, that the Aberdeen Lumber Company was the real party to the sales contract. Woollett was the president of the Aberdeen Lumber Company and the sole owner of the stock therein.

The evidence shows that the Aberdeen Lumber Company had full knowledge of the method of business, and that it had frequent reports as to the amount of lumber on hand, and furnished money for the purchase of other logs and other standing timber than the Swift timber. The logs purchased and the timber cut from other lands, as well as the timber cut from the Swift lands, were commingled, and the lumber manufactured was commingled.

The sales contract and the deeds of trust executed to Woollett by the Delta Hardwood Company were all subsequent to the recordation of Swift's deed to the Delta Hardwood Company and its deed of trust on the standing timber and other property in favor of Swift.

The evidence also shows that all sales of timber by the Delta Hardwood Company were conducted through the Aberdeen Lumber Company, and that collections were made by it and accounting made to the Hardwood Company. If the Hardwood Company sold direct, the sale could not be effectuated without being approved by the Aberdeen Lumber Company.

It was found by the court at the time of its decree in this case that the Hardwood Company owed the Aberdeen Lumber Company sixty-three thousand dollars. There was no accounting entered into between Woollett and the Hardwood Company, nor does the record note any accounts existing between Woollett and the Aberdeen Lumber Company.

The note due December 1, 1929, was paid, and, in addition, eight hundred ninety dollars was paid in December, 1929, on the note falling due on March 1, 1930. On March 1, 1930, the Delta Hardwood Company filed its bill against Swift, alleging the failure of the title to the standing timber, and that none of the notes for the deferred payments should be collected, and obtained a temporary injunction restraining Swift from undertaking to collect any of five remaining notes for the deferred purchase money.

Upon issue made up, the chancery court dissolved the injunction, and on December 31, 1929, entered its final order by which the bill of the Hardwood Company was dismissed and the injunction finally dissolved, and on Swift's cross-bill the court decreed that Swift might recover from the Hardwood Company the amount due on all the notes, $————, and ordered a sale of all lumber on the yards at Bovina, Mississippi, for the purchase-money lien thereon.

Swift had an attachment issued and served upon all the lumber then on the yards of the Hardwood Company. Subsequently, a considerable portion of the lumber was destroyed by fire, and there was collected from the insurance companies by virtue of their policies the sum of fourteen thousand seven hundred forty-eight dollars and thirty-three cents, which, by agreement of all parties, was paid over to the clerk of the chancery court to abide the decree of the court without prejudice to the rights of any of the parties. It was further agreed that this money was held subject to garnishment of Swift, the original complainant, and that all lumber remaining might be sold by the Aberdeen Lumber Company, and it was decreed that the amount of cash held by the clerk was sufficient to satisfy any decree which might be rendered in favor of Swift.

The evidence is undisputed that Woollett and the Aberdeen Lumber Company both had actual and constructive knowledge of Swift's vendor's lien on the standing timber in controversy.

By June 30, 1930, the Hardwood Company had cut and removed to its mill all of the standing timber on the Swift lands, and had sold all of it except forty thousand feet, and at a time when Swift was enjoined from enforcing his lien for the purchase money.

In December, 1931, the Hardwood Company was adjudged a bankrupt, and one Nelson was appointed a

trustee. On amendment, he was made a party as trustee in bankruptcy. He answered Swift's bill denying any knowledge of the facts in this cause, and stating that the liens were more than the value of the property involved, and prayed that the court award him whatever might be found to be due him. The answer showed neither authority to appear, nor want of it, from the bankrupt court which appointed him. The trustee in bankruptcy was not a party to the cross-bill of Woollett, nor did he make answer thereto. Subsequently, Sol Felner was appointed trustee instead of Nelson, and Felner was permitted by this court (See Swift v. Wollett, 148 So. 181) to appeal from the decree of the lower court in favor of the Aberdeen Lumber Company.

It was agreed in the lower court that more than two million feet of timber (stumpage) which, when cut and manufactured, would yield two million four hundred thousand feet, was cut and removed from the Swift lands, and that this was worth more than the amount of Swift's lien for the purchase money.

An examination of this record, and the many pages of briefs filed, discloses, we are convinced, that this case turns upon two propositions of law: (1) Did Swift, by the language in the deed, retain an effective vendor's lien on the standing timber conveyed? and (2) Did the letter of June 27, 1929, together with Thomas' evidence, constitute an estoppel on the part of Swift?

On the first proposition, in order to uphold the decree, it is the contention of the Aberdeen Lumber Company that the second paragraph, reserving a vendor's lien and permission to cut and remove the timber, impliedly grants to the vendee the power to sell, and that the provision for payments by the vendee, after cutting the timber, on the first of each month, constituted a waiver of the lien and further made the vendee the agent of the vendor, and the failure so to do became a mere

matter of debt and not a lien. This position is novel and ingenious, but it is unavailing.

In the first paragraph quoted above, the vendor's lien on the standing timber is retained unreservedly by him. In the second paragraph, there was permission expressly granted to cut and remove the timber, but upon condition that, when removing it, the vendee should have paid a stipulated price for the timber so cut, and it was subject to the first provision for a vendor's lien.

It will be observed that the grantor herein and the grantee both understood from the very terms of the deed that this timber was being sold for the vendor and purchased by the vendee for the purpose of being manufactured into lumber.

The vendee had purchased a sawmill in connection with the timber at Bovina, Mississippi, as shown by the deed. He had leased, for stacking the manufactured lumber, the lumber yard; the fifty-acre tract on which the sawmill was located.

It is perfectly patent that the vendor was selling timber to the vendee on credit for the express purpose and with the understanding that it would be manufactured into lumber. The words "cut and removed" are not subject to the implication that a power of sale is included therein, and every stipulation of the deed is in conflict with such a construction, which is at war with the prime purpose of the instrument. It is susceptible of the construction, readily and easily, viewed as a whole, that the parties intended to cut the timber, that is, fell the trees, for a month, pay for the amount so cut, and then they would be permitted to remove it. And this construction is rendered plain when we observe that, by the last paragraph of the deed and immediately following the language in reference to the cutting and removing of the timber, this broad statement is shown: "A vendor's lien is hereby retained to secure all deferred payments for

the purchase money.'' The preceding paragraph had provided for payments for the trees after they were felled by the woodsman's axe, and these payments were for the purchase money, and if deferred, and if not made, a lien was immediately declared to exist upon the timber after it was cut. So that, after the timber was borne to the sawmill and the lumber yard, the lien went with it as to the logs, and when the logs were transformed and manufactured into lumber, the lien still existed. There is no doubt about constructive notice of the contents of this deed in Woollett, as an individual, and as president of the Aberdeen Lumber Company. The deed was recorded, and both Woollett and the Hardwood Company entered into the sales agency contract, and mortgages were taken by Woollett on the stacks of lumber manufactured from the logs. This was a contractual vendor's lien granted by the vendee and retained by the vendor, and when the Aberdeen Lumber Company, as the equitable owner, and Woollett as president, entered into this agreement, the Aberdeen Lumber Company took whatever right it obtained thereby in the lumber subject to the vendor's lien with full notice thereof, and the rights of Swift thus became paramount and superior, and the Aberdeen Lumber Company, at best, occupies the position of a junior mortgagee with notice of the superior lien. See Walton v. Hargroves, 42 Miss. 18, 97 Am. Dec. 429, and 41 C. J. 528.

And the evidence is clear and undisputed that the Aberdeen Lumber Company, with notice of Swift's prior, superior lien, had the lumber manufactured from Swift's timber, and shipped to various points within and without this state, with bills of lading issued in its name, and no sale was permitted without its approval thereof, and it collected and appropriated all collections therefor; a clear-cut case of conversion of mortgaged property. It had no right so to do, and, by so doing, it wrongfully

appropriated mortgaged chattels to its own use, control, and benefit, and it is liable for the conversion. 11 C. ·J. 588; Witczinski v. Everman, 51 Miss. 841; Watson v. Cement Co., 93 Miss. 553, 46 So. 707, and Cole-McIntyre-Norfleet Co. v. Du Bard, 135 Miss. 20, 99 So. 474.

Consequently, Swift is entitled to recover herein the amount of his debt, which clearly exists, from the proceeds of the sale of lumber on which he had a vendor's lien, and which was wrongfully received and appropriated by the Aberdeen Lumber Company without discharging the lien.

While the Hardwood Company was busily engaged in removing the timber, Woollett, president of the Aberdeen Lumber Company, knew that the collection of these notes had been enjoined by the chancery court of Warren county, Mississippi.

We conclude therefore that, so far as the language of the deed is concerned, the vendor's lien for the purchase price of the timber was retained, and, as stated, the words "cut and remove" did not imply a power to sell, nor were they a waiver by implication of the lien stipulated for in the contract between the parties.

2. On the second proposition, which is based mainly on the letter dated June 27, 1929, signed by Swift and mailed to Woollett in Chicago, the letter having been prepared by Woollett in anticipation of the sales contract, we find that this letter establishes the fact that Swift knew that the Delta Hardwood Company had given a lease on the lumber yard at Bovina, Mississippi, and that he consented thereto, calling attention to the book and page in which his deed is recorded, and stating, "I agree and consent to this lease to you for the purposes and uses therein mentioned and set forth, and in order to properly protect advances you may make on said lumber," and further stated that there would be no charge from him on that account.

The testimony given by Thomas is to the effect that at some time, in a conversation with Swift, he told Swift the substance of his contemplated contract with Woollett, which establishes that Swift knew that Woollett or the Aberdeen Lumber Company was the exclusive sales agent of the Hardwood Company, and that the Hardwood Company would secure advances and give mortgages to secure same on manufactured lumber in stacks, and, so far as the record shows, raised no objection thereto.

This is the strongest possible view of the facts submitted to the court below, and, without hesitation, we say that this constituted no waiver of his lien on the part of Swift, even if this conversation with Thomas had been communicated to Woollett individually or as president of the Aberdeen Lumber Company, by Thomas, as the representative of the Hardwood Company. It was not so communicated.

The letter of June 27, 1929, and Swift's knowledge of the manner in which the Hardwood Company would conduct its business, constitute no waiver. These could not have induced Woollett or the Aberdeen Lumber Company to enter into any arrangement. The letter contained no language indicating an intention to waive the superior lien, and the rule is that the evidence of such a waiver or estoppel must be clear and convincing, and the mere fact that a mortgagee prior in right knows that the mortgagor is selling the premises or incumbering same by mortgage does not bind the mortgagee to release his security. 41 C. J. 504. There was no conduct in this case creating an estoppel. There was no agreement of estoppel.

Appellee cites the case of Seavey v. Godbold, 99 Miss. 113, 54 So. 838, and others following the rule announced therein, the effect of which is that where a landlord permits a tenant to sell property upon which he has a land-

lord's lien, and one purchases from the tenant, the latter is not liable to the landlord for the conversion. These authorities cannot be adjusted to the facts in this case. Here there was no estoppel by the conduct of the parties. Swift did not consent to waive his lien.

We therefore conclude that Swift is entitled to recover from Woollett and the Aberdeen Lumber Company the amount of the balance of the indebtedness due him under the vendor's lien reserved in his deed, as evidenced by the notes and the entire contract as exhibited by the deed and the notes. We cannot say with certainty what amount, because the dates of payment are not set forth in the record. The decree herein, therefore, should establish liability on the vendor's lien in favor of Swift against the named defendants. It appearing that the parties have set aside fifteen thousand dollars in the hands of the clerk of the chancery court of Warren county, Mississippi, deeming it, at that time, sufficient, and that this amount may or may not be sufficient, the court below will ascertain the amount of the indebtedness and adjudge it in accordance with this opinion, and will order that it be paid over to Swift, and that if the fifteen thousand dollars is insufficient, it will be paid to Swift by said clerk as a credit upon the judgment.

As to the trustee in bankruptcy, the assignment of error points exclusively to a decree in favor of the Aberdeen Lumber Company, and we are of the opinion that, as this decree has been reversed by this court, and as this appears to have been the aim of the trustee in bankruptcy, it would seem that we are not called upon to express any further opinion on this branch of this case. Nelson, the predecessor of Felner, simply entered his appearance in the lower court in response to Swift's bill. He filed no cross-bill, tendered Swift no issue, stated no ground for relief, and offered no evidence therein as to his authority, or want of it, from the federal court of bankruptcy. He

absolutely pleaded nothing, and furnished the court nothing upon which to base any decree. He did not dispute Swift's debt, nor his vendor's lien, and it now appears to us that by the consent of P. B. Swift and the Aberdeen Lumber Company all the property of the bankrupt was "released and discharged from any claim and/or liens of said P. B. Swift and from said attachment and from the jurisdiction of this court," save and except the amount of the proceeds of the fire insurance policies, which must be, if sufficient, paid over to Swift to satisfy his indebtedness, and, if insufficient, credited upon said indebtedness, by the decree herein of the lower court. If the trustee in bankruptcy, Felner, has any remedy, it must rest with the court which appointed him, or with the chancery court of Warren county. Certainly, he cannot raise a question in this court which was in no wise presented to the lower court.

There are many other questions presented, but, in view of the conclusion we have reached, we do not think it now necessary to consider them.

Reversed and remanded.